# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# DOCKET NO. 3:08CR260-R

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | **MEMORANDUM AND RECOMMENDATION** |
| ) | |
| **REGINALD LAMAR DAVIS,** ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendant's "Motion to Suppress Evidence" filed March 26, 2009 (document #7). The "Government's Response In Opposition To Defendant's Motion to Suppress" (document #11) was filed April 15, 2009. The undersigned conducted an evidentiary hearing on April 24, 2009. Therefore, the subject motion is now ripe for resolution.

## I. FACTUAL BACKGROUND AND FINDINGS

The events giving rise to the subject motion occurred on the evening of July 9, 2008. Charlotte-Mecklenburg Police Department Officers S. T. Flat and J. M. Dollar, a new police officer who was training with Officer Flat, were assisting in a saturation patrol on Nations Ford Road between I-77 and Arrowood Road in Charlotte, North Carolina. The purpose of the saturation patrol was to have six to eight officers patrolling the area and stopping all traffic violators in order to let their presence be known in the area, which is considered a high crime area. Earlier in the evening, the officers working patrol had been told that Officer Bolduc had in his possession a tint meter in case officers came across a vehicle believed to have illegal tint on its windows.

While sitting at Nations Ford Elementary School, Officer Flat observed a black Cadillac Deville drive by with very dark tinted windows. Officer Flat could not see inside the vehicle at all.

Officer Flat waved for Officer Bolduc, who was also sitting at Nations Ford Elementary School, to follow him. Officers Flat and Dollar initiated a traffic stop on the vehicle at 7837 Nations Ford Road. There was only one occupant in the vehicle, the driver and registered owner, Reginald Lamar Davis.

Officer Dollar approached the car on the driver's side and asked for Davis' driver's license and registration. Dollar explained to him that he had been pulled over because the tint on his windows appeared to be illegal. Officer Bolduc approached on the passenger's side and used the tint meter to obtain a reading on the front passenger window. The reading came back as a 26 which is below the legal tint limit of 28. Officer Bolduc explained to Davis that his tint was illegal in North Carolina.

Officers Flat and Dollar ran Davis' license through the system and found that his license was suspended for failure to appear. Officer Flat went back to the vehicle and explained to Davis that his license had been suspended. Davis indicated that he did not know his license had been suspended. Davis explained that he had received a ticket for a registration violation and that he had gotten it fixed at the DMV, but that he had not gone to court on the issue. Officer Flat explained to Davis that he was going to write him a citation for driving with a suspended license rather than placing him under arrest. He further advised Davis that he would not write him a citation for the tint violation.

Officer Flat returned to his patrol car and confirmed with Officer Dollar that they were only giving Davis a citation for driving with a suspended license. Officer Dollar wrote the citation for Davis and gave it to Officer Flat. Sergeant Brown, the supervisor of Officers Flat, Dollar and Bolduc, arrived at the scene and advised the officers that he had seen Davis' vehicle for over an

hourin the Oak Park Apartment complex, an area known for criminal activity.

Officers Flat and Dollar approached Davis' vehicle with Officer Flat on the driver's side and Officer Dollar on the passenger's side. Officer Flat asked Davis to step out of his vehicle. Officer Flat directed Davis towards the back of Davis' vehicle. Officer Flat asked Davis whether there were any drugs or weapons in his vehicle. Davis denied that there were. Officer Flat then asked Davis if the officers could search the vehicle, and Davis stated yes.

After asking for consent to search Davis' vehicle, Officer Flat explained the citation and court date to Davis, while Officer Dollar began an initial search of Davis' vehicle. On the patrol car's mobile video recorder ("MVR") recording, Officer Flat is seen pointing to the citation and discussing it with Davis while Officer Dollar is entering the passenger side of the vehicle and beginning the search. During this search, Officer Dollar indicated that he could not get the glove box open. Davis stated that there was a trick to opening the glove box and showed Officer Dollar how to open it. While Officer Dollar continued to search the vehicle, Officer Flat asked Davis if he could search his person and Davis consented. Officer Flat found $1,635.00 in cash in Davis' pocket. Sergeant Brown helped Officer Dollar with the initial search of Davis' vehicle. During this initial search, Officer Dollar found a small amount of marijuana between the passenger's seat and the center console.

After this discovery, Officer Flat told Davis to stay with Officer Bolduc while Officer Flat checked what Officer Dollar had found. Officer Flat then conducted a second search of Davis' vehicle. During this search of the vehicle, Officer Flat lifted the center arm console to investigate an area in between the seats. He located and hit a button which revealed a second console in between the front two seats under the arm rest that contained two bags of marijuana and a derringer

3

pistol in a black holster.

Officer Flat returned to Davis and placed him in handcuffs, with Officer Dollar tightening the handcuffs. Officer Flat asked Davis why he did not just tell him there was a gun in the vehicle and then asked Davis if he was a convicted felon. Davis stated that he was a convicted felon and that is why he had not told Officer Flat about the gun. Officer Flat then advised Davis of his Miranda rights. Davis stated that he understood these rights. Officer Flat then continued to question Davis and Davis made further incriminating statements.

## II. ANALYSIS

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of a persons within the meaning of the Fourth Amendment." Delaware v. Prouse, 440 U.S. 648, 653 (1979); Accord Whren v. U.S., 517 U.S. 806, 809-10 (1996). "An automobile stop is thus subject to the constitutional imperative that it not be unreasonable under the circumstances." Whren at 810. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517, 806, 810 (1996)(citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)).

Ordinarily, the Supreme Court's analysis in Terry v. Ohio, 392 U.S. 1 (1968), governs routine traffic stops. United States v. Meikle, 407 F.3d 670, 672 (4th Cir. 2005). Terry requires the Court to determine "whether the officer's action was justified at its inception, and whether it was

4

reasonably related in scope to the circumstances which justified the interference in the first place." Id. (quoting Terry, 392 U.S. at 20). The permitted scope of a "routine traffic stop" is narrowly defined. United States v. Brugal, 209 F.3d 353, 358 (4th Cir. 2000) (en banc)(quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). The Fourth Circuit has held that the proper investigative scope of a routine traffic stop is as follows:

> The officer may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning. Any further detention for questioning is beyond the scope of the Terry stop and therefore illegal unless the officer has reasonable suspicion of a serious crime.

United States v. Rusher, 966 F.2d 868, 876-77 (4th Cir. 1992) (internal quotation and citation omitted).

If the initial traffic stop was illegal or the officers exceeded the stop's proper scope, the seized contraband is excluded under the "fruit of the poisonous tree doctrine." Id. at 875. "Statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will." Florida v. Royer, 460 U.S. 491, 501 (1983).

In this case, Davis does not dispute the constitutionality of the initial stop of his vehicle. Officers Flat and Dollar initiated a routine traffic stop based on the belief that the tint of Davis' windows was illegal. Officer Dollar requested Davis' license and registration. While in the patrol car, Officer Flat ran a computer check of Davis' license, found that it was suspended and had Officer Dollar write Davis a citation for having a suspended license. All of these actions were valid within the proper investigative scope of a routine traffic stop as explained in United States v. Rusher, 966 F.2d 868, 876-77 (4th Cir. 1992). However, Davis asserts that the continued questioning by Officer Flat constituted an unlawful seizure in violation of his Fourth Amendment rights and therefore, his

5

consent to search was tainted by the unlawful seizure, so the resulting evidence and statements must be suppressed.

The government argues that Davis plainly consented to the search of his vehicle and that the search was the product of a consensual encounter between Davis and Officer Flat. If the initial traffic stop "becomes a consensual encounter, the Terry inquiry would not be employed, and the stop would instead be governed by the Supreme Court's analysis in Florida v. Bostick, 501 U.S. 429 (1991), because a consensual encounter does not trigger Fourth Amendment scrutiny." United States v. Meikle, 407 F.3d 670 (4th Cir. 2005) (internal quotation and citation omitted).

Under Bostick, the question is "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Bostick, 501 U.S. at 439. See also United States v. Lattimore, 87 F.3d 647, 653 (4th Cir. 1996) (en banc); United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989). This inquiry involves an objective analysis of the totality of the circumstances. United States v. Weaver, 282 F.3d 302, 309-10 (4th Cir. 2002). "Circumstances where a citizen would feel free to go, but stays and has a dialogue with the officer are considered consensual." Id. "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." Immigration and Naturalization Service et al. v. Delgado, 466 U.S. 210, 216 (1984).

In analyzing the totality of the circumstances test,

> [C]ourts look to numerous factors including the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the officer's statement to others present during the encounter, the threatening presence of several officers, the potential display of a weapon by an officer and the physical touching by the police of the citizen to determine consent.

United States v. Weaver, 282 F.3d 302, 310 (4th Cir. 2002). A highly material factor in the totality of the circumstances analysis is the retention of "a citizen's identification or other personal property

or effects." Id.

In United States v. Weaver, although expressly refusing to adopt a bright line rule that "when an officer retains an individual's identification beyond its intended purpose. . .the individual whose identification is retained is effectively seized," the Fourth Circuit did note that in the context of a routine traffic stop, "the retention of one's driver's license would have effectively seized the individual because it is illegal to drive without a license in one's possession." Id. at 310-11.[1]

The Fourth Circuit has found that routine traffic stops became consensual encounters on several occasions. See United States v. Farrior, 535 F.3d 210 (finding that the fact that the Officer had returned driver's license and registration "strongly indicates that the encounter was consensual and that no seizure occurred within the meaning of the Fourth Amendment." Id. at 219); United States v. Meikle, 407 F.3d 670 (4th Cir. 2005)(holding that after officer had returned license and registration, had shaken Meikle's hand, and Meikle began walking back to his car, the consensual encounter commenced); United States v. Sullivan, 138 F.3d 126 (4th Cir. 1998) (holding that a search was consensual even though an officer repeatedly asked questions about the presence of illegal items in the car, after returning a suspect's license at the conclusion of a traffic stop); United States v. Rusher, 966 F.2d 868 (4th Cir. 1992) (holding that encounter became consensual once the officer told the defendant he was "free to go" and then asked permission to search the vehicle). However, the unifying characteristic of all these cases is that the officers returned the citizen's identification before requesting consent to search, thus a reasonable person would have felt free to leave before the consent to search was given.

By contrast, in the instant case, Officer Flat clearly asked for consent to search Davis'

---

[1] The Fourth Circuit relied heavily on the fact that Weaver was a pedestrian at the time and could have terminated the encounter and walked away from the officer without his identification. Id. at 311-12.

vehicle before handing him the citation. Because Davis' license was suspended, Davis needed the citation in order to leave the scene and continue on his way. Therefore, without the citation, a reasonable person would not have felt free to leave or decline Officer Flat's requests. The retention of Davis' citation is not the only factor that indicates that this was not a consensual encounter between Officer Flat and Davis. Officer Flat asked Davis to exit the vehicle when he returned with the citation and directed him to the back of his car. There were also four officers present at the routine traffic stop. After Officer Flat asked Davis for consent to search his vehicle, he continued to discuss the citation with Davis, while Officer Dollar began the search of the vehicle. Given the totality of the circumstances surrounding the encounter, the undersigned finds that the encounter was not consensual and amounts to an unlawful seizure. Specifically, the facts support a finding that a reasonable person in Davis' position would not have felt free to leave or terminate the encounter.

Finding the encounter between Officer Flat and Davis not a consensual one, the undersigned must determine if Officer Flat had reasonable suspicion of a serious crime in order to further detain Davis. United States v. Rusher, 966 F.2d 868, 876-877 (4th Cir. 1992); See also Florida v. Royer, 460 U.S. 491, 498-99 (1983). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. United States v. Arvizu, 544 U.S. 266 (2002) (reaffirming "totality of the circumstances" test); United States v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989).

The legitimacy of an investigative stop thus turns on what constitutes "reasonable suspicion," which the Fourth Circuit has called "a common-sensical proposition . . . [properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993). Accord Arvizu, 544 U.S. at 273 (permitting "officers to draw

on their experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person") (internal quotation omitted).

Because the intrusion created by an investigative stop is minimal, the reasonable suspicion standard is not onerous. See, e.g., United States v. McCoy, 513 F.3d 405, 412-13 (4th Cir.), cert. denied, 128 S. Ct. 2492 (2008) (experienced officer's observation of vehicles parked briefly in store parking lot where drug sales had previously occurred, then move to another nearby lot where drug sales had also occurred and where occupant of one vehicle got into the other vehicle for a short time, after which that vehicle left at a high rate of speed as officer approached, sufficient to constitutes reasonable suspicion); United States v. Harris, 39 F.3d 1262, 1268-69 (4th Cir. 1994) (officer's observation of man leaving apartment in a vehicle after confidential informant advised drug delivery was imminent constitutes reasonable suspicion to stop vehicle); United States v. Turner, 933 F.2d 240, 242-44 (4th Cir. 1991) (officer with experience in narcotics investigations had reasonable suspicion to stop and determine whether subject was "cooking" illegal drugs after observing her carry cup of water out of convenience store, walk to car, and lean over front seat as if to hide something); and United States v. Moore, 817 F.2d 1105, 1107 (4th Cir. 1987) (officer's nighttime observation of man walking away from otherwise deserted area where burglar alarm had just gone off constitutes reasonable suspicion to stop man). However, the officer "must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000).

Many factors have been approved as properly contributing to "reasonable suspicion." Among them are: (1) presence in a high crime area, United States v. Perkins, 363 F.3d 317, 320-21 (4th Cir. 2004); United States v. Christmas, 222 F.3d 141 (4th Cir. 2000), cert. denied, 531 U.S. 1098 (2001); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) and (2) evasive conduct, United States v. Smith, 396 F.3d 579, 585-87 (4th Cir.), cert. denied, 545 U.S. 1122 (2005); United States v. Humphries,

372 F.3d 653, 657-60 (4th Cir. 2004); United States v. Tate, 648 F.2d 939, 943 (4th Cir. 1981) (attempt by subjects to hide their faces).

Being in a "high crime area," standing alone, is not enough to constitute "reasonable suspicion." Illinois v. Wardlow, 528 U.S. at 124. However, it clearly is a relevant factor to be considered in the overall calculus. Id. Accord United States v. Black, 525 F.3d 359, 365-66 (4th Cir. 2008) (being in high crime area combined with other enumerated factors constituted "reasonable suspicion" to detain and frisk defendant); United States v. Mayo, 361 F.3d 802, 804-07 (4th Cir. 2004) (being in high crime area, combined with suspicious, evasive, and nervous conduct constituted "reasonable suspicion" and justified frisk for officer's protection); and Christmas, 222 F.3d at 145 ("although [the defendant's] presence in a high crime area is not alone sufficient to justify a Terry stop, the fact that the stop occurred in a high crime area [is] among the relevant contextual considerations in a Terry analysis").

Applying these well established principles of law to the facts in this case, the undersigned cannot find, even under the relatively low Terry standard, that the Officers had reasonable suspicion to continue to detain Davis and request consent to search his vehicle. Specifically, Officer Flat testified that Davis was extremely cooperative throughout the encounter. On the MVR recording, Davis does not appear nervous, shifty or suspicious in any degree and rather appeared cooperative and talkative. Officer Flat wanted to search Davis' vehicle was because Sgt. Brown had informed him in the course of the traffic stop that he had seen Davis' vehicle at the Oak Park Apartments, a high crime area, for over an hour. Sgt. Brown testified that he had been patrolling at Oak Park Apartments earlier in the shift because it was a known area for armed robberies and the police were trying to be highly visible in the area. However, there was no evidence from any of the Officers that would support a finding of reasonable suspicion of criminal activity other than Davis' mere presence

10

in a high crime area.

In sum, when looking at the totality of the circumstances, including what was known by Officer Flat at the time of the stop and what reasonable inferences he could have drawn from that knowledge, Officer Flat did not have reasonable suspicion, based on specific and articulable facts to believe that Davis may have been involved in criminal activity. Thus, the continued detention of Davis was illegal.

Given the original purpose of the stop, the failure to give Davis the citation and the fact that Davis was not free to leave, the undersigned cannot find the stop to be a consensual encounter. Furthermore, Davis' willing cooperation with the officers and the fact that Davis' vehicle had been at the Oak Park Apartment complex, a high crime area, for over an hour do not rise to the level of reasonable suspicion justifying the search of Davis' vehicle and person.

Evidence seized as a result of an illegal stop is subject to the fruit of the poisonous tree doctrine. See, e.g., Wong Sun v. United States, 371 U.S. 471 (1963), United States v. Hassan El, 5 F.3d 726 (4th Cir. 1993). Because the search of Davis' vehicle was unconstitutional, the subsequent discovery of the marijuana, gun and statements made by Davis must be suppressed as the fruit of the poisonous tree. If not for the illegal search of Davis' vehicle, Officer Dollar would never have found the small bag of marijuana, Officer Flat would never have found the gun and larger bag of marijuana, and Officer Flat would have never questioned Davis about the gun. As such, all evidence and statements stemming from the unconstitutional search must be suppressed.

### III. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that the Defendant's "Motion To Suppress Evidence" be **GRANTED**.

## IV. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Wells, 109 F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum And Recommendation And Order to counsel for the parties; and to the Honorable Martin K. Reidinger.

**SO ORDERED AND RECOMMENDED.**

Signed: May 5, 2009

David S. Cayer
United States Magistrate Judge